792 So.2d 1045 (2000)
PRUDENTIAL BALLARD REALTY COMPANY, INC., and Hugh Weimorts
v.
James WEATHERLY and Carol Weatherly.
1981671.
Supreme Court of Alabama.
July 28, 2000.
Opinion Overruling Rehearing December 1, 2000.
Dissenting Opinion on Overruling of Rehearing December 22, 2000.
*1046 E. Hamilton Wilson, Jr., Clyde C. Owen, Jr., and T. Cowin Knowles of Ball, Ball, Matthews & Novak, P.A., Montgomery, for appellants.
Edward B. Parker II, Montgomery, for appellees.
Les Hayes III of Melton, Espy, Williams & Hayes, Montgomery, for amicus curiae Alabama Association of Realtors.

On Application for Rehearing
PER CURIAM.
The opinion released April 14, 2000, is withdrawn and the following is substituted therefor.
The defendants Prudential Ballard Realty Company, Inc., and its agent Hugh Weimorts appeal from a judgment entered on a jury verdict in favor of the plaintiffs James Weatherly and his wife Carol Weatherly. The Weatherlys had sued the defendants for damages based on fraudulent misrepresentations they allege the defendants made while the defendants had the Weatherlys' home listed for sale. We affirm.
"In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party...." Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala.1999). Considered in that manner, the evidence suggests the following facts: In May 1995, the Weatherlys listed their Montgomery home for sale with Weimorts. Weimorts then assisted the Weatherlys in finding a home to purchase in Lowndes County. The Weatherlys signed a contract to purchase a home in Lowndes County, but the contract was contingent upon the Weatherlys' finding a purchaser for their Montgomery home before August 30, 1995. On August 28, 1995, Eddie Stallworth and his wife signed a contract to purchase the Weatherlys' Montgomery home. The Stallworths' contract was contingent on the Stallworths' being able to obtain financing for the purchase. Weimorts assured the *1047 Weatherlys that the Stallworths had the financing to purchase the Weatherlys' home, when in fact they did not. The Weatherlys told Weimorts that they could not afford to own both homes at the same time. Based upon Weimorts' misrepresentations, the Weatherlys closed on the purchase of the Lowndes County home and, anticipating closing on the sale of the Montgomery home, allowed the Stallworths to move into the Montgomery home. The Stallworths, however, were never able to get financing for the purchase of the Montgomery home; they began making rental payments to the Weatherlys. The Weatherlys did not sell the Montgomery home until October 1996. The Weatherlys allege that they suffered financial injury and mental anguish from October 1995 to October 1996, the 12-month period during which they owned both homes. The Weatherlys filed an action in Lowndes County to recover damages based upon the defendants' misrepresentations. The jury awarded the Weatherlys $250,000 in compensatory damages and $2.5 million in punitive damages. The trial court denied the defendants' motion for a new trial and their motion for a judgment as a matter of law, but conditioned its denial of a new trial on the Weatherlys' accepting a remittitur of punitive damages of $1,250,000. The Weatherlys accepted the remittitur.
The following issues are presented for review:
1. Whether the defendants were entitled to a judgment as a matter of law on the ground that the evidence was insufficient to submit the plaintiffs' claims to the jury;
2. Whether the defendants were entitled to a new trial on the ground that the plaintiffs engaged in racial discrimination in the use of their peremptory challenges;
3. Whether the defendants were entitled to a new trial on the ground that the trial court refused to give three of their requested jury instructions (nos. 53, 63, and 65);
4. Whether the defendants were entitled to a new trial on the ground that the compensatory-damages award was excessive; and,
5. Whether the defendants were entitled to a new trial on the ground that the punitive-damages award (as remitted) was excessive.
With respect to the first issue, we note that we have carefully considered the defendants' argument that the evidence was insufficient for the trial court to submit the Weatherlys' claims to the jury. We conclude that the trial court properly denied the defendants' motion for a judgment as a matter of law. The evidence created fact questions for the jury to resolve.
As to the second issue, the record indicates that the jury was selected from a panel of 35 veniremembers. Of that panel, 26 members were black; 9 were white. The Weatherlys' attorney used nine of his peremptory challenges to remove white veniremembers and two of his peremptory challenges to remove black veniremembers. The Weatherlys and Weimorts are white. The defendants, relying on a number of cases, including Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), challenged the Weatherlys' use of their peremptory challenges and argued that the challenges were motivated by impermissible racial discrimination as evidenced by the removal from the panel of all nine white veniremembers. Following the procedure set out in Ex parte Branch, 526 So.2d 609 (Ala.1987), the trial court asked the Weatherlys to explain the reasons for their challenges. The defendants *1048 argue that the reasons given were pretextual. The trial court found the reasons given to be race neutral. We have reviewed the reasons given by the Weatherlys for each challenge, and we do not find the trial court's findings on this issue to be clearly erroneous. Ex parte Branch, supra; Ex parte Thomas, 659 So.2d 3 (Ala. 1994) (discussing the "clearly erroneous" standard for reviewing the trial court's findings of fact on a Batson challenge).
In connection with their third issue, the defendants argue that the trial court erred to reversal in refusing three of their requested jury instructions. The record indicates, however, that requested instruction no. 53, which deals with one's duty to mitigate damages, was properly refused because the defendants did not affirmatively plead mitigation of damages as a defense, either in their answer or at any time during the trial. Any matter constituting an avoidance or affirmative defense, such as mitigation of damages, must be affirmatively pleaded. See Rule 8(c), Ala. R.Civ.P.; Harkins & Co. v. Lewis, 535 So.2d 104 (Ala.1988). Although the defendants did raise the issue just before the case was submitted to the jury (by objecting to the trial court's refusal to give requested instruction no. 53), the evidence relied on by the defendants in support of their mitigation-of-damages argument was sufficiently within the proof of the issues that were properly before the court to preclude the operation of Rule 15(b), Ala. R.Civ.P. See Harkins & Co. v. Lewis, supra. The trial court did not err in denying the defendants' requested instruction no. 53.
Furthermore, we find no error in the trial court's refusal of the defendants' requested instructions nos. 63 and 65. Section 6-11-20, Ala.Code 1975, provides, in part:
"(a) Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Nothing contained in this article is to be construed as creating any claim for punitive damages which is not now present under the law of the State of Alabama.
"(b) As used in this article, the following definitions shall apply:
"(1) FRAUD. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"(2) MALICE. The intentional doing of a wrongful act without just cause or excuse, either:
"a. With an intent to injure the person or property of another person or entity, or
"b. Under such circumstances that the law will imply an evil intent.
". . . .
"(5) OPPRESSION. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."
The trial court instructed the jury in part as follows:
"If you are reasonably satisfied that the Defendants or either of them has been shown by clear and convincing evidence to be guilty of an intentional misrepresentation, *1049 deceit, or a concealment of a material fact that the Defendant had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the Defendant of thereby depriving the Plaintiff of property or legal rights or otherwise causing injury and the Plaintiff did suffer such injury or damage as a proximate result of the fraud or deceit, then in your discretion you may award punitive damages in addition to the actual damages."
Requested instruction no. 63 set out the definition of "malice," as stated in § 6-11-20(b)(2); requested instruction no. 65 set out the definition of "oppression," as stated in § 6-11-20(b)(5). Relying on § 6-11-20(b)(1), the plaintiffs based their fraud claims, with the exception of their reckless-fraud claim, on allegations of intentional misrepresentation, deceit, and suppression. Section 6-11-20(b)(1) defines "fraud" as "[a]n intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose [that] was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." That section also states that in order to award punitive damages it must be shown by clear and convincing evidence that the misrepresentation, deceit, or suppression was "gross, oppressive, or malicious." The terms "malicious" and "oppressive," as defined above, and the term "gross," which is defined as inexcusable, flagrant, or shameful, see Talent Tree Personnel Services, Inc. v. Fleenor, 703 So.2d 917 (Ala.1997), are subsumed within the definition of fraud in § 6-11-20(b)(1). In other words, it cannot seriously be argued that an intentional act of fraud committed for the purpose of "depriving a person or entity of property or legal rights or otherwise causing injury," is not a gross, malicious, or oppressive act, as those terms are defined in § 6-11-20. In short, for purposes of applying § 6-11-20(b)(1), the terms "gross," "malicious," and "oppressive" are redundant. The trial court adequately instructed the jury with respect to the plaintiffs' fraud claims.
As to the fourth issue, the defendants contend that the compensatory-damages award is excessive because, they argue, the award consists primarily of damages awarded as compensation for mental anguish and, they argue, the evidence does not support a substantial compensatory-damages award for mental anguish. When a court is assessing whether compensatory damages are excessive, the focus is on the plaintiff. A court reviewing a verdict awarding compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective. There is no fixed standard for ascertaining what are adequate compensatory damages for mental anguish. A determination of how much to award is left to the sound discretion of the jury, subject only to correction by the court if the jury clearly abused its discretion or was improperly influenced by passion or bias. When there is no evidence before the court of any misconduct, bias, passion, prejudice, corruption, or improper motive on the part of the jury, or when there is no indication that the jury's verdict is not consistent with the truth and the facts, there is no statutory authority to invade the province of the jury in awarding compensatory damages. See Pitt v. Century II, Inc., 631 So.2d 235 (Ala.1993).
Here, the jury awarded the Weatherlys a total of $250,000 in compensatory damages, most of which, the record indicates, was compensation for mental anguish. *1050 After reviewing the record, we conclude that the evidence of the Weatherlys' out-of-pocket losses, together with the evidence of the mental anguish they suffered as a result of the defendants' actions, supported the jury's award of compensatory damages. The evidence indicates that the Weatherlys suffered financial hardship and that they were put under a great deal of stress as the result of the defendants' actions. The Weatherlys worried about not being able to pay their bills on time; they were forced to borrow money from family members and from Carol Weatherly's employer. There was additional evidence that the Weatherlys had "crying spells"; that James Weatherly was treated for depression and that he lost weight; that Carol Weatherly suffered from Tourette's syndrome (a neurological condition that causes involuntary muscle movements and uncontrollable verbalization) and that the stress caused by the defendants' actions had made that condition worse; and that the stress of the situation had interfered with the Weatherlys' marital relationship. Based on our review of the record, we can find no indication that the compensatory-damages award (which, we emphasize, was to compensate both of the Weatherlys for, among other things, the mental anguish they suffered) was the result of any misconduct, bias, passion, prejudice, corruption, or improper motive on the part of the jury, nor was there any indication that the verdict was not consistent with the truth and the facts. Therefore, we have no authority to invade the province of the jury and reduce the compensatory-damages award.
With respect to the fifth issue, the jury, in addition to compensatory damages, awarded punitive damages in the amount of $2.5 million. The trial court reduced that award to $1.25 million. The defendants argue that $1.25 million is excessive.
When reviewing a trial court's award of punitive damages, this Court looks to the three guideposts set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), as well as the factors listed in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). In reviewing the facts of the present case in light of those factors, we find that the facts of this case will not support the award of $1.25 million. In particular, we note that Weimorts's conduct, though reprehensible, was not so reprehensible as to support a $1.25 million punitive-damages award; nor did Weimorts or Ballard profit greatly from that conduct. Therefore, we conclude that a $750,000 punitive-damages award would be sufficient to punish the defendants and to deter them from further similar conduct, without compromising their due process rights.
For the reasons stated above, we affirm the judgment of the trial court on the condition that the Weatherlys file with this Court within 21 days a remittitur of punitive damages to the sum of $750,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
OPINION OF APRIL 14, 2000, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; AFFIRMED CONDITIONALLY.
MADDOX and ENGLAND, JJ., concur.
HOUSTON, COOK, LYONS, and JOHNSTONE, JJ., concur specially.
SEE and BROWN, JJ., concur in part and dissent in part.
HOOPER, C.J., dissents.
*1051 HOUSTON, Justice (concurring specially).
I am aware of Acts of Alabama, Act No. 99-358, which was entitled as an act "[t]o regulate the award of punitive damages in civil actions and to provide an effective date for this act." Even though the Act was made effective immediately upon its passage and approval by the Governor (the Governor's approval was given on June 7, 1999, before the trial of this case), § 4 of the Act provided, "This act shall apply to all actions commenced more than 60 days after the effective date of this act." Therefore, this Act applies to actions commenced after Friday, August 6, 1999 (considerably after the date this action was filed), and it does not apply to this action. If this Act did apply to this action, then, based upon defendant's Exhibit H3, Prudential Ballard Realty Company, Inc., would be considered a "small business" under that Act, for it has a net worth of less than $2 million, and the punitive-damages award would have to be limited to $50,000, which apparently is greater than 10% of Prudential Ballard Realty Company's net worth. If the Legislature had made Act No. 99-358 apply to all cases tried after the "effective date" of June 7, 1999, then I would have voted to limit punitive damages to $50,000 in this case.
However, for those cases involving the alleged excessiveness of a punitive-damages award in actions filed no later than August 6, 1999, I would apply the following rules.
In reviewing punitive-damages awards in cases decided after BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), this Court has struggled with the question whether a specific punitive-damages award is reasonable. Although the United States Supreme Court provided guidance in BMW by setting out the three guideposts to use as factors(1) the degree of reprehensibility; (2) the ratio of actual or likely harm to punitive damages; and (3) the sanctions imposed for comparable misconduct, see BMW, 517 U.S. at 574-75, 116 S.Ct. 1589, there is no set analysis to help trial courts or appellate courts apply these guideposts. See Paul M. Sykes, Marking a Road to Nowhere? Supreme Court Sets Punitive Damages Guideposts in BMW v. Gore, 75 N.C.L.Rev. 1084 (March 1997). This lack of analysis has allowed the law in this area to become muddled, which, in turn, has led to unpredictability in the amounts of punitive damages this Court has approved. For example, we have held to be constitutionally acceptable ratios of punitive damages to compensatory damages ranging from 1:1 in Ford Motor Co. v. Sperau, 708 So.2d 111 (Ala.1997), to 121:1 in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). See Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 979 (Ala. 1998).
This unpredictability has caused confusion among the judiciary, the bar, and perhaps most importantly, the public; therefore, I feel the need to write specially and to set out the steps I believe this Court should take to alleviate the confusion that unpredictability has caused.
As I see it, the unpredictability faced by both plaintiffs and defendants in an action seeking both compensatory damages and punitive damages can result in two major problems. The first is faced by potential plaintiffs who have incurred an injury for which, although the potential compensatory damages are small, a jury may consider assessing punitive damages against the defendant. Because there is no clear road map as to the amount of punitive damages that is constitutionally recoverable, such plaintiffs may understandably encounter difficulty in obtaining counsel. In other words, an attorney who undertakes to represent *1052 a plaintiff on a contingency-fee basis in a case where the compensatory damages are low anticipates the major portion of any fee will be derived from the punitive-damages award. Therefore, it is important that the law provide an accurate indication as to the amount of damages a plaintiff can reasonably expect in a given case.
In addition, this unpredictability can pose a problem for defendants as well:
"Once again, however, the results in [the first 10 cases dealing with punitive damages decided by this Court after the United States Supreme Court's decision in BMW] provide no real predictability of how future awards of punitive damages will be analyzed on appeal. Perhaps more importantly, these results have nothing to say about the initial stage of the process, the jury trial. Even if a defendant had a rough notion that an `excessive' verdict might be significantly reduced on appeal, there is nothing in the post-Gore decisions from which that defendant could reasonably predict what amount of punitive damages might result from the trial court's instructions to the jury. In other words, one-half of an indefinite number is still an indefinite number."
E. Berton Spence, Punitive Damages in Alabama After BMW v. Gore: Are Out-comes Any More Predictable? 59 Ala. Law. 314 (Sept.1998). Without knowing a range within which their potential damages are likely to fall, it is impossible for a defendant to accurately evaluate a case for settlement purposes.
Because of these problems, I believe that the following analysis should be used in determining whether a punitive-damages award is excessive.
Once it has been established that punitive damages are appropriate in a particular case, I would establish a benchmark amount of the greater of $20,000 or 3 times the compensatory-damages award as the cornerstone for the analysis in that case.[1] This amount would be the standard punitive-damages award for that case. If a punitive-damages award does not exceed the benchmark amount, I would consider it to be presumptively reasonable. Any deviation greater than that amount would require special justification if it is challenged by the defendant. In assessing the justification, the Court would apply the factors set out in BMW, Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), such as the reprehensibility of the defendant's conduct, whether that conduct resulted in physical injury to the plaintiff, the defendant's financial position, any criminal sanctions, and any other civil *1053 actions against the same defendant based on the same conduct. In such a situation, where the punitive-damages award is greater than the benchmark amount, the plaintiff would have the burden of establishing the justification to support that deviation.
If the punitive-damages award is lower than the benchmark amount, the defendant could present evidence to rebut the presumption that the award is reasonable; however, the burden in this scenario would be on the defendant to prove that, under the factors set out in BMW, Hammond, and Green Oil, the award, while at or below the benchmark amount, is nonetheless excessive. Only in the most extraordinary situations would the award be deemed excessive when that amount is at or below the benchmark. See Wilson v. Dukona Corp., 547 So.2d 70 (Ala.1989); Employees' Benefit Ass'n, 732 So.2d 968; Ford Motor Co., 708 So.2d 111.
In setting this benchmark amount, I do not intend to establish a mathematical formula for determining punitive damages in every case. As the United States Supreme Court has stated: "Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." BMW, 517 U.S. at 582, 116 S.Ct. 1589. Punitive-damages awards would continue to be analyzed on a case-by-case basis, and the jury would maintain the discretion to set those damages in an amount it deems necessary. Green Oil, 539 So.2d at 222. However, the reasonableness of the award of those damages would still be subject to judicial review, and, when the award of punitive damages is challenged, I would use the benchmark amount as a means of determining if any deviation from this amount is justified. See Id.
I believe that with this analysis in place, the two problems noted above would be alleviated. A plaintiff would be able to secure counsel, because attorneys would know that if an award of punitive damages is appropriate, any judicial review of that award probably would not result in a reduction of the award of punitive damages below $20,000. This should ensure that a plaintiff can obtain counsel in a case even if the potential compensatory damages are particularly low. Furthermore, this analysis would allow a defendant to adequately evaluate his or her case, because a defendant would know the general range of punitive damages that can be expected to be approved in the ordinary case.
In the present case, the Weatherlys were awarded compensatory damages of $250,000. Therefore, the benchmark amount of punitive damages for this case is $750,000 ($250,000 × 3 = $750,000). The jury awarded $2.5 million in punitive damages. After conducting a hearing in accordance with BMW, Hammond, and Green Oil, the trial court entered an order reducing the punitive damages award to $1.25 million.
The punitive-damages award, as remitted, is still greater than the benchmark amount of $750,000; therefore, under my proposed test, the plaintiffs would have the burden of proving a special justification for the deviation from the 3:1 ratio, based on the factors discussed in BMW, Hammond, and Green Oil.
After reviewing the facts of this case in light of the BMW, Hammond, and Green Oil factors, I find that there is no special justification here.[2] Therefore, I concur *1054 with the majority's reduction of the punitive-damages award to $750,000, but I do so because it would be the benchmark amount under the analysis I have set out in this special writing.
COOK, Justice (concurring specially).
I concur in the main opinion. I also join in the reasoning expressed in Justice Lyons's concurring opinion.
LYONS, Justice (concurring specially).
I concur in the per curiam opinion. I write specially to discuss the standards applicable to a recovery of punitive damages. In the more than two years that I have served on this Court, we have repeatedly faced the difficult issue of determining the appropriate proportion of compensatory damages to punitive damages that will afford a defendant the rights guaranteed under the Due Process Clause of the Fourteenth Amendment as articulated in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW I").
Before the release of BMW I, arguments for using a low-digit multiplier of compensatory damages to arrive at the appropriate punitive-damages award were not well received. In Alabama, a punitive-damages award, to be upheld, did not need to bear any particular mathematical relationship to the compensatory-damages award in the case. See, e.g., U-Haul Co. of Alabama v. Long, 382 So.2d 545 (Ala. 1980); accord, Associates Fin. Servs. Co. of Alabama, Inc. v. Barbour, 592 So.2d 191 (Ala.1991). In earlier times, the practitioner could try a case for a plaintiff without laying a strong predicate for ample compensatory damages solely to protect a possibly substantial award of punitive damages from a remittitur. The customary practice began to change dramatically with the release of BMW I. On May 9, 1997, this Court released its opinion in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997), on remand from the United States Supreme Court ("BMW II"), in which it approved a punitive-damages-to-compensatory-damages ratio of approximately 12:1. Although I believe that a stated preference for applying, as a rule of thumb, a comparatively low multiplier is unfair to plaintiffs in those cases tried before the clarification of the law concerning the need for significant compensatory damages as a basis for determining the amount of punitive damages,[3] I do not see the necessity for similar concern in cases tried after the change in the law became clear. Most of those earlier cases appear to have worked their way through the system. On the other hand, I am not convinced that low-digit multipliers are mandated in every case.
*1055 We must strike a delicate and difficult balance. Under the Criminal Code, a detailed schedule of punishments permits a would-be wrongdoer to analyze in advance the consequences of the contemplated conduct. Without standards, there is no predictability to the consequences of contemplated conduct, and the actor risks the arbitrary imposition of horrific punishments for the slightest wrong.
The wisdom of degrees of punishment for criminal acts is within the province of the Legislature, subject to constitutional challenges for excessiveness. This Court does not sit as a legislative body and, moreover, the separation-of-powers doctrine, set out in § 43 of the Constitution of Alabama of 1901, demands that we refrain from legislative action. We must therefore confine our action to those rules laid down in the adjudication of cases as they come before us, because we are not the appropriate body to declare in advance elaborate standards suitable for gauging an appropriate civil penalty in the myriad of settings in which mankind might manifest its frailty. Yet, from both a constitutional perspective and as judges whose duty it is to administer fair and effective justice, we are required to set some standards.
I applaud Justice Houston's special concurrence for its commendable effort to address a defendant's need for predictability while at the same time recognizing that a slavish adherence to a low multiplier would insulate certain wrongdoers simply by making it uneconomical to make them accountable. Justice Houston endorses a "benchmark" of the greater of a 3:1 ratio of punitive damages to compensatory damages or $20,000. The burden of upholding an award above the benchmark would be on the plaintiff. Justice Houston quite properly observes that the United States Supreme Court has consistently rejected a ratio or a mathematical formula for determining punitive damages. See BMW I, 517 U.S. at 582, 116 S.Ct. 1589.
Justice Houston's formula is only a benchmark; it is not a rigid formula subject to criticism for going beyond the constitutional boundaries set in BMW I. My concern is not with the end but with the means. I fear that Justice Houston's benchmark may err too far on the side of predictability by drawing an excessively bright line, albeit only in the form of a guideline. But I do not believe that the solution is the complete rejection of any standards. The trial courts, the bar, and last, but certainly not least, the public are entitled to a compass to guide them in this exceedingly difficult area.
I believe we should endorse, as a general rule, a presumptively reasonable benchmark that is pegged to a range rather than a specific number. I recognize that dulling the bright line may lead to an equally offensive vagueness, but at this stage of our walk down this path I prefer to err in that direction.[4] A general rule of preference for single-digit benchmarks serves society's dual needs for adequacy of standards while effectively meeting the goals of deterrence and punishment in civil cases. The use of a range of single-digit benchmarks has impeccable credentials.[5]
*1056 We should not, however, embrace single-digit benchmarks without recognizing the need for an exception where necessary to prevent a range of wrongdoing from escaping accountability. Justice Houston's solution of allowing $20,000 in punitive damages to pass muster without regard to the ratio reflects commendable sensitivity to the problem of making wrongdoers accountable in those cases where a plaintiff has only a modest claim for compensatory damages. I suggest that we deal with the problem by recognizing in such cases the propriety of multipliers sufficiently high so that both the plaintiff and the plaintiff's attorney will have adequate incentive to secure accountability for reprehensible conduct. Without such an approach, a well-financed and litigious defendant could easily make the presumptive floor of $20,000 highly unattractive to both the plaintiff and the plaintiff's counsel.
Litigation costs are a traditional factor to be applied in gauging the excessiveness of punitive damages. Life Ins. Co. of Georgia v. Parker, 726 So.2d 619, 624 (Ala. 1998). We should announce that we are prepared to mute a defendant's shrill claims of "sticker shock" in instances of high ratios resulting from modest claims for compensatory damages by taking into account high litigation costs. Our end should be accountability for reprehensible conduct, even where compensatory damages are small, by creating a climate where the public knows that this Court will uphold a punitive-damages award in an amount sufficient to justify a plaintiff's risk, effort, and inconvenience in being a party to civil litigation and, at the same time, fairly compensate the plaintiffs attorney for the risk and effort necessary to obtain such a result.
COOK, J., concurs.
JOHNSTONE, Justice (concurring specially).
I concur in the main opinion in the context of a very valuable aspect of Justice Houston's special writing. Specifically, I concur in Justice Houston's recommendation that we establish a punitive-damages benchmark of the greater of either $20,000 or three times the actual harm caused by the tort, with the burden on the plaintiff to justify any deviation above the benchmark and the burden on the defendant to justify a remittitur that would deviate below the benchmark. I recognize that the $20,000 alternative of the benchmark may require some reevaluation over time or in peculiar cases.
SEE, Justice (concurring in part and dissenting in part).
I agree with the majority's opinion conditioning its affirmance on the plaintiff's acceptance of a remittitur of the punitive-damages award; however, I believe the punitive-damages award, even as reduced to $750,000, is excessive. I agree that a punitive-to-compensatory ratio of 3:1 is a useful benchmark for analyzing whether a punitive-damages award is excessive, see Life Insurance Co. of Georgia v. Johnson, 701 So.2d 524, 535 (Ala.1997) (See, J., concurring in part and dissenting in part), but an award based on that ratio is only presumptively reasonable. In this case, a punitive-damages award of three times the amount of the compensatory-damages award is excessive. First, the amount of compensatory damages in this case, of which approximately $200,000 is to compensate for mental anguish, is the outer limit of a permissible compensatory-damages award; I believe that fact mitigates against applying the benchmark multiplier. Second, although Weimorts's conduct was reprehensible, it was not so reprehensible as to justify punishment to the extent of *1057 $750,000. Accordingly, I dissent from the majority's conclusion that $750,000 is a permissible punitive-damages award in this case.
BROWN, J., concurs.
HOOPER, Chief Justice (dissenting).
I must respectfully dissent. The punitive damages awarded by juries in some counties in this State can get out of hand. It is up to this Court to evaluate the excessiveness of such awards. Considering BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW I"), and the newly enacted statutory cap, the punitive-damages award in this case was an unpredictable consequence of the defendant's actions and perhaps even a denial of due process. A seller of real estate is dependent on a buyer's obtaining financing. Some responsibility for knowing the difficulties of obtaining such financing must rest with the seller.
A passage in the amicus curiae brief of the Alabama Association of Realtors explains my feelings regarding this case:
"Perhaps the best way to analyze this case is to take a step back, remove all the complexities and intricacies of the financial dealings, and recognize the situation for what it is: a real estate transaction that experienced some problems. It is unfortunate that the problems developed. Nevertheless, it is undeniable that snags, delays, and other problems occur quite often in real estate transactions. The process which culminates in the purchase or selling of a home is a slow one, which lends itself to all sorts of problems and pitfalls ...."
The Weatherlys' entire case is premised upon an allegation that Mr. Weimorts falsely told them that potential buyers, the Stallworths, had been "approved" for a loan. Essentially, the conduct the trial court found so "reprehensible" was Weimorts's passing along to the sellers, the Weatherlys, information from a mortgage lender. Weimorts testified that at the time of the closing on the Steep Creek house, Heidi Ogleson of American Mortgage had told Weimorts that the Stallworths' loan should close by October 15, 1995. Weimorts testified that he was acting under the assumption that the Stallworths' loan approval was imminent. Section 6-11-20(a), Ala.Code 1975, provides that punitive damages may not be awarded unless "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." "Clear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." § 6-11-20(b)(4). "Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." § 6-11-20(b)(4). "Fraud" is defined as "[a]n intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." § 6-11-20(b)(1).
No evidence was presented indicating that Weimorts's alleged misrepresentation or concealment was "gross, oppressive, or malicious" or that it was committed with the intention to injure the Weatherlys. The evidence presented by the Weatherlys indicating that Weimorts had deliberately *1058 engaged in fraud consisted of the testimony of the Weatherlys that Weimorts had told them that the Stallworths had been approved for a mortgage loan. The evidence in opposition indicates that Weimorts relied on the representation of the mortgage lender to the effect that the Stallworths would be approved for a loan and that the closing could occur on October 15. The Weatherlys' evidence does not produce a firm conviction that Weimorts "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the [Weatherlys]." § 6-11-20(a).
This Court needs to return to the punitive-damage analysis followed in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW II"), including an analysis of the BMW I guideposts and the Green Oil factors.[6] Such an analysis in this case indicates that the punitive-damages award is excessive. The per curiam opinion does not address each factor individually; therefore, I must point out some deficiencies in the trial court's order.

Degree of Reprehensibility
In BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the United States Supreme Court stated: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575, 116 S.Ct. 1589. It further stated: "That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award." 517 U.S. at 580, 116 S.Ct. 1589.
In evaluating the reprehensibility of the defendants' conduct in the Weatherlys' case, the trial court made the following assessments, which I consider to be legally insufficient to support the punitive-damages award.
First, the trial court stated: "Defendants persist in denying any wrongdoing. They admit they have taken no remedial action to prevent such occurrences in the future." I can understand, under the particular facts in this case, the defendants' arguing that they had done nothing wrong. Therefore, the trial court should not have used this argument as support for a finding of reprehensibility.
Second, the trial court stated: "This Court notes that additionally, the Defendants had an early opportunity to remedy this problem as reasonable settlement offers were made by representatives for the plaintiffs prior to the institution of litigation." In my opinion, the defendants have the right to defend their actions in a court of law. They cannot be punished for refusing to settle a claim they believe has no merit. The defendants certainly should not be punished to the extent of a $750,000 punitive-damages award for exercising their constitutional right to a trial by jury. Whether a defendant has refused a settlement offer has no place whatsoever in an analysis of whether the defendant's conduct was so reprehensible as to support an award of punitive damages. The trial court's statement suggests that resort to the judicial process comes at the price of judicial retribution. Suddenly, the reprehensibility of the defendants' conduct is enhanced. Additionally, "persistence in denying wrongdoing" is not a proper indicator of the degree of reprehensibility of the conduct under scrutiny.

Ratio of Likely Harm to Punitive Damages
The evidence presented at trial indicated that the Weatherlys' suffered economic *1059 damage of no more than $25,000. The jury returned a verdict of $250,000, based primarily on the mental anguish suffered by the Weatherlys. I think it is important to note that the $750,000 punitive-damages award upheld by the per curiam opinion is 30 times the economic damage suffered by the plaintiffs. I would also note that there was no expert testimony to support the claims that the aggravation of Mrs. Weatherly's Tourette's syndrome or Mr. Weatherly's depression were caused by stress resulting from the real-estate transaction.

Does the Punitive-Damages Award Remove the Defendants' Profit?
The trial court did not address this issue in its order. The gross commission on the purchase of the Steep Creek house was $3,850. Of that amount, Weimorts received 70% and Ballard received 30%. The $750,000 punitive-damages award is almost 195 times greater than the total gross commission earned by the defendants. Even a substantial reduction in the punitive-damages amount would obliterate any profit the defendants derived from this transaction.

The Financial Position of the Defendant
The trial court did not consider the financial position of the defendant based on its net worth, as BMW II contemplates. Instead, the trial court stated that the defendants' insurance would cover up to $1,900,000 of the award, and perhaps a greater amount. The trial court also stated that the defendants "insist that the corporate Defendant has a negative net worth based on the unaudited financial reports" but also noted that "the corporate Defendant has income of over $3 million for each of the last three years." The trial court refused to consider Ballard's net worth in assessing the financial position of the defendants.
In 1999, the Alabama Legislature amended § 6-11-21, Ala.Code 1975, by enacting Act No. 99-358, Ala.Acts 1999. That Code section places a statutory cap on punitive damages. Although the statute is not applicable to the present case, which was filed before August 6, 1999, the "effective date" of Act No. 99-358, it is a persuasive indicator that the punitive damages awarded in this case are excessive. The Legislature has spoken as to how courts should reach a fair punitive-damages award, and this Court should not ignore its guidance. If the statute were applicable to this case, based on § 6-11-21(b) and (c), Ballard would fit within the definition of "small business," and the punitive damages would be capped at $50,000. The vast difference between the $50,000 cap of § 6-11-21 and the $750,000 awarded in this case surely indicates excessiveness.
Finally, after the closing of the Woodbridge home did not occur as planned, Weimorts continued to work to secure a lender for the Stallworths, so that the Weatherlys could sell the Woodbridge house. Ironically, the Stallworths were initially approved for a mortgage by the Marble Mortgage Company in November 1995, but that company decided to withdraw from doing business in Alabama because it believed the legal climate here was unfavorable. The result of this case will be that even more businesses will want to withdraw from doing business in Alabama. Any mistake by a realtor who hopes a buyer will obtain financing and who relies on a financing company for such a prediction will be fair game in Alabama for any plaintiff who wants to be a millionaire.

On Second Application for Rehearing
PER CURIAM.
The defendants' application for rehearing is overruled.
*1060 On original submission, this Court, on April 14, 2000, reversed the judgment entered on the jury's verdict for the plaintiffs. Agreeing with the defendants, this Court held that the trial court had erred in refusing to instruct the jury on the law with respect to the plaintiffs' responsibility to take reasonable steps to mitigate their damages. The case was remanded for a new trial. The plaintiffs' attorney, Edward B. Parker II, filed an application for rehearing in which he made a principled argument that this Court's initial holding was in error because, he said, the defendants had not timely raised the affirmative defense of mitigation of damages. Mr. Parker argued that the defendants had waived this affirmative defense and, therefore, that the trial court had properly refused to instruct the jury on it. See Harkins & Co. v. Lewis, 535 So.2d 104 (Ala. 1988); Frederick v. Kirby Tankships, Inc., 205 F.3d 1277 (11th Cir.2000). This Court, on July 28, 2000, withdrew its original opinion and issued a new opinion affirming the judgment, conditioned on the plaintiffs' accepting a reduction of the punitive-damages award. The defendants have applied for a second rehearing.
The application for rehearing serves the laudable purpose of allowing this Court to rectify any errors in its opinions, so that the ends of justice may be ultimately achieved. In this respect, this Court's decision on the first application for rehearing was not unlike its decisions in other cases this Court has reconsidered. See, e.g., Ex parte Ward, 447 So.2d 142 (Ala. 1983); Norton v. Mobile County, 562 So.2d 503 (Ala.1990); Bailey Mortgage Co. v. Gobble-Fite Lumber Co., 565 So.2d 138 (Ala.1990); Garner v. Barnett, 576 So.2d 234 (Ala.1991); Ex parte State Dep't of Revenue, 667 So.2d 1372 (Ala.1995). Distinguishing this case from the others, however, are the unprofessional comments contained in the brief filed by the plaintiffs' attorney in support of the first application for rehearing. Mr. Parker, unfortunately, did not stop with his argument on the merits of the jury-instruction issue. He accused members of this Court of selling favorable decisions to the highest bidder. Mr. Parker's remarks in this regard, as unfounded and completely unprofessional as they are, sadly are indicative of a growing trend among some attorneys who feel that an application for rehearing provides them with a bully pulpit for venting their frustrations after receiving an adverse decision. Whether some attorneys believe it to be necessary to spew this venom for the benefit of their unhappy clients or to take the spotlight off their own inadequacies as legal practitioners, such childish behavior is uncivil and beneath the members of a professional bar association and it is a dangerous method of appellate advocacy. By couching a rehearing argument in the form of a written temper tantrum, an attorney can detract from the merits of the argument and do his or her client irreparable harm by failing to maintain the required level of professionalism.
The members of this Court may not always agree on the outcome of a particular case; however, this Court as an institution strives to decide each case correctly, based on the law and the particular facts. In this respect, this case was decided in the same way any other case brought before this Court would be decided.
APPLICATION OVERRULED.
HOUSTON, COOK, LYONS, and JOHNSTONE, JJ., concur.
MADDOX, J., concurs in the result.
HOOPER, C.J., and SEE, BROWN, and ENGLAND, JJ., dissent.
*1061 HOOPER, Chief Justice (dissenting).
The per curiam opinion does not adequately address the pertinent issues in this case; therefore, I must dissent. First, this Court must take a more responsible position as to the propriety of one party's striking each and every minority member of a venire. Second, it is the function of this Court to honor caselaw and statutory precedent to the utmost; any alteration, especially an alteration to the prejudice of a party innocently doing business, should be highly suspect. Third, this Court must take responsibility for monitoring and, where appropriate, adjusting punitive-damages verdicts to conform to the standards set forth in our caselaw. Fourth, we must heed our duty to act as a fair and neutral body, yet convey the message that our decisions are influenced by nothing other than the law and the facts of each individual case. Last, we must discipline with particular strength those attorneys who would descend to unprofessional attacks on the integrity of this Court, lest we become complicit in destroying the public's confidence in this Court.

I. The Batson[1]Analysis

First, the per curiam opinion issued on the initial application for rehearing gives only passing reference to the Batson issue. Although the three-step Batson analysis is well-settled law, there are no definite standards by which to determine whether the party striking a minority veniremember is using a pretext for a racially discriminatory strike. The only clear standard in this Court's precedent is that the trial court's determination shall not be reversed unless it is "clearly erroneous." See Ex parte Branch, 526 So.2d 609 (Ala.1987). I believe Prudential Ballard presents in its application for rehearing a solid argument that is comparable to that presented in Smith v. Jackson, 770 So.2d 1068 (Ala. 2000). The facts in this particular case are almost identical to those in Smith and they call for a reversal, as this Court ordered in that case.
In Smith, a husband and wife sued a building-contractor corporation and its owner, alleging breach of express warranty and breach of contract in regard to the construction of their home. The husband and wife, the Jacksons, used their peremptory strikes to remove all white veniremembers. The circuit court eventually accepted a jury verdict in favor of the husband on the breach-of-contract and breach-of-the-express-warranty claims and entered a judgment on that verdict. The contractor appealed; this Court reversed and remanded. This Court wrote in Smith:
"The jury venire was composed of 8 white persons and 29 black persons. The Jacksons exercised peremptory challenges against all eight white veniremembers. The defendants made a Batson objection, and the trial court required the Jacksons to provide race-neutral reasons for each of the eight contested challenges. The trial court found that the Jacksons' stated reasons were race-neutral, were not pretextual, and were based on information disclosed during voir dire examination. On appeal, the defendants argue that, as to three of the white veniremembers, the Jacksons' stated reasons were pretextual and were not based on information disclosed during voir dire. With respect to one of the veniremembers, we agree.
"The Jacksons' attorney offered the following reason for striking veniremember M.H.:
"`She worked for the Welch's company selling baby stuff all up and down *1062 through this area for years. I don't know how much stuff she sold to every person in the county including the Smiths. You have got toyou know yourself when you sell baby stuff to these people who are now defendants, I thought that whether or not she would admit it you keep seeing everybody as little Jimmy Smith or little Mac Smith or something like that.'
"There was no information disclosed during voir dire concerning M.H.'s alleged past employment with Welch's or her having sold `baby stuff to Mac Smith or his family. The Jacksons' attorney did, however, ask the veniremembers during voir dire whether any of them knew either of the Jacksons. M.H. did not indicate that she did.
". . . .
"... The explanation given by the Jacksons' attorney as to why he struck M.H. was not based on information disclosed during voir dire. The explanation given by the Jacksons' attorney is somewhat cryptic, but it appears that his reason for asserting a peremptory challenge against M.H. was either that M.H. knew Mac Smith because she had in fact sold `baby stuff to him or to his family, or that M.H.'s former occupational experiences would somehow influence her to look upon Smith more favorably than upon the Jacksons.
"If M.H. had in fact sold `baby stuff to Mac Smith or his family, and that fact had been disclosed during voir dire, we might accept the trial court's finding that the reason offered by the Jacksons' attorney was legitimate and race-neutral. See Looney [v. Davis,] 721 So.2d [152,] at 165 [(Ala.1998)], (noting that `"[s]trikes based on the veniremember's relationship to or acquaintance with the defendant or with the defendant's witnesses have generally been upheld"') (quoting Rowe v. State, 625 So.2d 1210, 1211 (Ala.Crim.App.1993)). The Jacksons' attorney, however, could easily have ascertained during voir dire whether that was a fact, but failed to do so. Therefore, we must conclude that, to the extent the explanation given by the Jacksons' attorney can be understood as implying that M.H. knew Mac Smith, it was based on `intuitive judgment or suspicion' and did not constitute a legitimate, race-neutral reason for the peremptory strike. Looney, 721 So.2d at 165.
"To the extent the explanation given by the Jacksons' attorney can be understood as implying that M.H. would be influenced by her former occupation to look more favorably upon Mac Smith than upon the Jacksons, it also fails to constitute `a clear, specific, and legitimate reason for the challenge which relates to the particular case ... and which is nondiscriminatory.' [Ex parte] Branch, 526 So.2d [609] at 623 [(Ala. 1987)] (emphasis omitted). Although a veniremember's past or present occupation can be a legitimate, race-neutral reason for a peremptory strike, see Burlington Northern R.R. v. Whitt, 575 So.2d 1011, 1018 (Ala.1990), cert. denied, 499 U.S. 948, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991), `strikes allegedly based upon a veniremember's occupation have not been upheld where the employment does not appear in any way to "relate[ ] to the particular case to be tried."' Looney, 721 So.2d at 166 (quoting Branch, 526 So.2d at 623). The Jacksons' attorney offered no reason why M.H.'s former occupation of selling `baby stuff was relevant to this case involving home construction, and we do not perceive any such reason. Therefore, we hold that, under the facts of this case, the trial court abused its discretion in finding that the reasons given by the *1063 Jacksons' counsel for striking M.H. were not pretextual.
"This Court has stated that `the removal of even one juror for a racially discriminatory reason is a violation of the equal protection rights of both the excluded juror and the party challenging the peremptory strike.' Looney, 721 So.2d at 163 (citing Ex parte Jackson, 640 So.2d 1050 (Ala.1993), and Ex parte Bird, 594 So.2d 676 (Ala.1991)). Because the trial court erred in accepting as race-neutral the Jacksons' explanation for striking veniremember M.H., we reverse the trial court's judgment and remand this case for a new trial."
770 So.2d. at 1072-74 (emphasis added.)
The facts of this case are very similar to those in Smiththey do not support a finding that the reasons offered for the strike were not pretextual. In this case, the venire consisted of 9 Caucasians and 26 African-Americans, and every Caucasian member of the venire was struck. Potential juror # 24 was struck because his wife was employed by someone who had been asked about that potential juror and who said that that potential juror was quite conservative, very defense-oriented, and did not need to be on the jury. Counsel for the Weatherlys made no attempt to follow up on the comments with questions to juror # 24 regarding whether those comments were true, and no evidence in the record supports his dismissal from the venire. Similarly, the excuse given for striking potential juror # 56 was that while investigating the venire list before trial it was learned that she had previously served as a witness in an unrelated case involving an insurance company and that her husband was associated with the local water-works board and appeared outspoken, argumentative, and closed-minded. Once again, counsel for the Weatherlys made no attempt to follow up with questions concerning these allegations, and the record contains no evidence to support his reason for striking her from the venire. The excuse given for striking potential juror # 101 was that he had served on a federal jury in a civil matter where an inmate sued the state and that he had a background in the military which, as purported by the Weatherlys, "relate[d] to one of the defendants in this case and also witnesses in this case." Therefore, counsel for the Weatherlys deemed him unable to "afford to [the Weatherlys] an opportunity to have a level playing field and be able to [make] a decision ... based on the facts and the evidence." However, the Weatherlys offered no relevant, specific evidence as it related to this particular juror to support their excuse for striking him. Potential juror # 144 was struck, counsel said, because he was a truck driver and had been a plaintiff in a small property-damage case and was leery of the legal system. Again, the Weatherlys offered no relevant evidence in the record to justify striking him and did not attempt to follow up these allegations with questions concerning his ability to be objective or his alleged bias against the legal system.
I do not believe any great distinction can be made between Smith and the instant case; but, if it can be, then this is an issue that we need to fully consider in order to clarify the law regarding pretext and the "clearly-erroneous" standard. Otherwise, they both appear to be cases in which potential jurors were dismissed from the venire for reasons that were never explored during voir dire, as to which no relevant evidence was offered, and as to which there was offered no legitimate reason to justify their dismissal. The constitutional principle of Batson depends on this Court's willingness to address forthrightly this problem so that the bench and bar will not be confused. The per curiam opinion issued on the first application for *1064 rehearing in this case provides no such guidance and, when considered in the light of Smith, is quite confusing.

II. Mitigation of Damages
Second, I am concerned with this Court's recent determination that the defense of mitigation of damages is an affirmative defense. Rule 8(c), Ala.R.Civ.P., does not explicitly list mitigation of damages as an affirmative defense. The only precedent the Weatherlys can claim on behalf of their contention that mitigation of damages is an affirmative defense is a recent line of cases that seem to deviate from long-standing Alabama caselaw to the contrary. See Harkins & Co. v. Lewis, 535 So.2d 104 (Ala.1988); see also 5 Wright & Miller, Federal Practice & Procedure, § 1273; cf. People's Shoe Co. v. Skally, 196 Ala. 349, 71 So. 719 (1916); Mobile & O.R.R. v. Williams, 221 Ala. 402, 129 So. 60 (1930). What has changed as to the status of the law between the time this Court issued its original opinion in April and the time it issued its modified opinion on rehearing in July? Certainly no facts or actions at the trial level have changed. Nor has the law changed during that time. The only thing that has changed is this Court's interpretation of controlling precedent time-honored caselaw and the Alabama Rules of Civil Procedure versus derivations insinuated by recent decisions such as Harkins & Co. and federal legal theory from Wright and Miller, both of which stand to alter or change the rule of law in this state. I continue to stand by this Court's conclusion on original submission that because mitigation of damages is not an affirmative defense, the trial court erred in refusing to instruct the jury in this regard.

III. The Punitive Damages Verdict
Third, the July 28, 2000, per curiam opinion neglects to conduct the appropriate assessment of the remittitur under the analysis set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW I"), Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). The amount of the remittitur appears to be especially egregious in light of the statutory punitive-damages cap that has since been passed by the Alabama Legislature.
The Weatherlys' entire case is premised upon an allegation that Mr. Weimorts falsely told them that potential buyers, the Stallworths, had been "approved" for a loan. Essentially, the conduct the trial court found so "reprehensible" was Weimorts's passing along to the sellers, the Weatherlys, information from a mortgage lender. Weimorts testified that at the time of the closing on the Steep Creek house, Heidi Ogleson of American Mortgage had told Weimorts that the Stallworths' loan should close by October 15, 1995. Weimorts testified that he was acting under the assumption that the Stallworths' loan approval was imminent. Section 6-11-20(a), Ala.Code 1975, provides that "[p]unitive damages may not be awarded in any civil action" unless "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." "Clear and convincing evidence" is defined as "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." § 6-11-20(b)(4). "Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." § 6-11-20(b)(4). "Fraud" is defined as "[a]n *1065 intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." § 6-11-20(b)(1).
No evidence was presented indicating that Weimorts's alleged misrepresentation or concealment was "gross, oppressive, or malicious" or that it was committed with the intention to injure the Weatherlys. The evidence presented by the Weatherlys indicating that Weimorts had deliberately engaged in fraud consisted of the testimony of the Weatherlys to the effect that Weimorts had told them that the Stallworths had been approved for a mortgage loan. The evidence in opposition indicates that Weimorts relied on the representation of the mortgage lender to the effect that the Stallworths would be approved for a loan and that the closing could occur on October 15. The Weatherlys' evidence cannot produce a firm conviction that Weimorts "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the [Weatherlys]." § 6-11-20(a).
Had this Court properly analyzed the facts in this case under the appropriate BMW, Green Oil, and Hammond standards, it should have been clear that the punitive-damages award is excessive. The July 28, 2000, per curiam opinion does not address each factor individually; therefore, I must point out some deficiencies in the trial court's order.

A. Degree of Reprehensibility

In BMW I, the United States Supreme Court stated: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575, 116 S.Ct. 1589. It further stated: "That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages, does not establish the high degree of culpability that warrants a substantial punitive damages award." 517 U.S. at 580, 116 S.Ct. 1589.
In evaluating the reprehensibility of the defendants' conduct in the Weatherlys' case, the trial court made the following assessments, which I consider to be legally insufficient to support the punitive-damages award.
First, the trial court stated: "Defendants persist in denying any wrongdoing. They admit they have taken no remedial action to prevent such occurrences in the future." I can understand, under the particular facts in this case, the defendants' arguing that they had done nothing wrong. Therefore, the trial court should not have used this argument as support for a finding of reprehensibility.
Second, the trial court stated: "This Court notes that additionally, the Defendants had an early opportunity to remedy this problem as reasonable settlement offers were made by representatives for the plaintiffs prior to the institution of litigation." In my opinion, the defendants have the right to defend their actions in a court of law. They cannot be punished for refusing to settle a claim they believe has no merit. The defendants certainly should not be punished to the extent of a $750,000 punitive-damages award for exercising their constitutional right to a trial by jury. Whether a defendant has refused a settlement offer has no place whatsoever in an analysis of whether the defendant's conduct was so reprehensible as to support an award of punitive damages. The trial court's statement suggests that resort to the judicial process comes at the price of judicial retribution. Suddenly, the reprehensibility of the defendants' conduct is *1066 enhanced. Additionally, "persistence in denying wrongdoing" is not a proper indicator of the degree of reprehensibility of the conduct under scrutiny.

B. Ratio of the Punitive Damages Award to the Likely or Actual Harm

The evidence presented at trial indicated that the Weatherlys suffered economic damage of no more than $25,000. The jury returned a verdict of $250,000, based primarily on the mental anguish suffered by the Weatherlys. I think it is important to note that the $750,000 punitive-damages award upheld by the July 28, 2000, per curiam opinion is 30 times the economic damage suffered by the plaintiffs. I would also note that there was no expert testimony to support the claims that the aggravation of Mrs. Weatherly's Tourette's syndrome or Mr. Weatherly's depression were caused by stress resulting from the realestate transaction.

C. Does the Punitive Damages Award Remove the Defendants' Profit?
The trial court did not address this issue in its order. The gross commission on the purchase of the Steep Creek house was $3,850. Of that amount, Weimorts received 70% and Ballard received 30%. The $750,000 punitive-damages award is almost 195 times greater than the total gross commission earned by the defendants. Even with a substantial reduction, the punitive-damages amount would obliterate any profit the defendants derived from this transaction.

D. The Financial Position of the Defendant

The trial court did not consider the financial position of the defendant based on its net worth, as BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW I"), contemplates. Instead, the trial court stated that the defendants' insurance would cover up to $1,900,000 of the award, and perhaps a greater amount. The trial court also stated that the defendants "insist that the corporate Defendant has a negative net worth based on the unaudited financial reports" but also noted that "the corporate Defendant has income of over $3 million for each of the last three years." The trial court refused to consider Ballard's net worth in assessing the financial position of the defendants.
In 1999, the Alabama Legislature amended § 6-11-21, Ala.Code 1975, by enacting Act No. 99-358, Ala. Acts 1999. That Code section places a statutory cap on punitive damages. Although the statute is not applicable to the present case, which was filed before August 6, 1999, the "effective date" of Act No. 99-358, it is a persuasive indicator that the punitive damages awarded in this case are excessive. The Legislature has spoken as to how courts should make a fair punitive-damages award, and this Court should not ignore its guidance. If the statute were applicable to this case, then, based on § 6-11-21(b) and (c), Ballard would fit within the definition of "small business" and the punitive damages would be capped at $50,000. The vast difference between the $50,000 cap of § 6-11-21 and the $750,000 awarded in this case surely indicates excessiveness.
After the closing of the Woodbridge home did not occur as planned, Weimorts continued to work to secure a lender for the Stallworths, so that the Weatherlys could sell the Woodbridge house. Ironically, the Stallworths were initially approved for a mortgage by the Marble Mortgage Company in November 1995, but that company decided to withdraw from doing business in Alabama because it believed the legal climate here was unfavorable. The result of this case will be that even more businesses will want to withdraw from doing *1067 business in Alabama. Any mistake by a realtor who hopes a buyer will obtain financing and who relies on a financing company for such a prediction will be fair game in Alabama for any plaintiff who wants to be a millionaire.

IV. Candor Toward the Court
Last, I am disappointed, both professionally and personally, in the conduct of counsel for the Weatherlys. In his briefs to this Court, he has effectively accused this Court of tailoring decisions to satisfy special-interest groups and has further insinuated that several of the Justices have thereby violated the Canons of Judicial Ethics. Presumably, he did this all in an effort to more effectively represent his clients. He has done nothing of the sort.
He has succeeded in offending the members of this Court and negatively portraying himself before his fellow members of the Bar. Specifically, using offensive language, unfounded accusations, and personal attacks, he has alleged that this Court's decisions depend on campaign contributions; he has done this presumably with the hope of intimidating this body into deciding his case in his clients' favor. By his language, he has violated Rule 3.5(c) of the Rules of Professional Conduct in that he has engaged "in conduct intended to disrupt a tribunal." In insinuating in his brief that this Court's vote on a matter can be bought by special-interest dollars, he has violated Rule 8.2(a) by making statements "with reckless disregard as to [their] truth or falsity concerning the qualifications or integrity" of the members of this Bench. His derogatory comments made about and to this Court might imply to the public that this Court changed its opinion as to his clients' case and ruled in their favor upon rehearing because of fear of exposure and not based on the law and the facts of this case. Therefore, he violated Rule 8.4(d) by engaging "in conduct that is prejudicial to the administration of justice." His explicit remarks in his brief suggesting that our decisions are made in terms of campaign contributions imply that the rich and powerful have an ability to improperly influence Justices in their roles as government officials and therefore violate Rule 8.4(e). These expressions of contempt, threat, and intimidation made when he filed his clients' application for rehearing violate Rule 8.4(g), because by making these expressions he has engaged in conduct that adversely reflects upon his fitness to practice law. Not only do his actions cause me to question his maturity to practice law before this Court, but it is exactly this kind of juvenile behavior that reflects poorly on our entire profession. I could as easily accuse this attorney of petulance resulting from his chagrin at receiving a lower contingent attorney fee after the release of this Court's original opinion. Such an accusation would be inappropriate for a judicial officer; I will not make it. Such conduct is also inappropriate for an officer of the courts; but this lawyer committed just such conduct.
This lawyer risked sinking his clients' case by making these unfounded accusations. If this Court were inclined to rule in its own self-interest, perhaps we would posit our decision in this case solely on the basis of our contempt for the attitude of this one attorney; however, this body has always held, and will continue to hold, itself to a higher standard. We will not let our emotions and personal feelings dictate the result in any case; our decisions are governed solely by the law and the facts. However, the public, not knowing enough about the facts of this case or the legal principles governing its result, may mistakenly interpret our decision as one where the mere accusations and political posturing of the attorney intimidated the Court into ruling in his clients' favor, instead *1068 of thinking the Court was persuaded by the legal arguments.[2] Such a perception on the part of the public and the resultant effect upon a client's cause, perhaps a just cause, is enough to call for the most severe sanctions against an attorney who resorts to such tactics. The attorney's language taints the judiciary and the legal profession and could seriously backfire upon his clients.
Having said all this, I can say confidently and with a clear conscience that my opinion is based on the law and the facts of this case alone, that I fear no one's reprisal or intimidation for holding this opinion, and that no campaign contribution influenced my opinion.[3] Contrary to the arguments of the plaintiffs, the facts of this particular case show that the defendants are "the little guys" who have been subject to mistreatment. Ever since I became a circuit court judge in Montgomery County in 1975, I have sought to look out for the "little man" to the fullest extent permissible under the law, and I would only hope that all judges exhibit a similar attitude. The attorney for the plaintiffs should be placed under the most severe sanctions appropriate for the kind of unprofessional behavior illustrated by his language in the plaintiffs' application for rehearing.
SEE, Justice (dissenting).
Although I agree with the statements of the main opinion on this second application for rehearing, I dissent from the overruling of the application. As I stated on July 28, 2000, in my special writing on the first application for rehearing, I believe the punitive-damages award, even as reduced to $750,000, is excessive.
BROWN, J., concurs.
ENGLAND, Justice (dissenting).
I dissent from the overruling of the second application for rehearing. I agree *1069 with the Batson analysis in Chief Justice Hooper's dissenting opinion.
NOTES
[1] Both the Alabama Legislature and Congress have established treble damages as the most common punitive standard. Ala.Code 1975, § 8-19-10(a)(2) (providing for treble damages for certain violations of the Deceptive Trade Practices Act); § 37-2-18 (providing treble damages for certain harm caused by common carriers); 18 U.S.C. § 1964(c) (providing for treble damages for civil violations of the Racketeer Influenced and Corrupt Organizations Act); 15 U.S.C. § 15 (providing for treble damages for violations of the Sherman Act's prohibition on monopolistic practices).

I also note that the use of a multiple of compensatory damages as a penalty has ancient and biblical origins. The ancient law of Rome required restitution of four times the amount wrongfully taken. VIII The Interpreter's Bible 326 (1952). Jewish law provided: "If a man shall steal ... a sheep, and kill it, or sell it; he shall restore ... four sheep for a sheep." Exodus 22:1. Zacchaeus promised: "`[I]f I have defrauded any one of anything, I restore it fourfold,'" which was acceptable. Luke 19:1-10. The New Oxford Annotated Bible with the Apocrypha, Expanded Edition (1977), pages 1273-74. These laws provide for the return of the amount wrongfully taken plus three times the amount wrongfully taken.
[2] Section 6-11-24(b) provides: "The appellate court shall independently reassess the nature, extent and economic impact of such an award and reduce or increase the award if appropriate in light of all the evidence." We note that although § 6-11-24(b) has not been declared unconstitutional, this Court, in Bozeman v. Busby, 639 So.2d 501 (Ala.1994), in a 5-3 decision, with Justices Almon, Shores, Kennedy, Ingram, and Cook concurring and Justices Maddox, Houston, and Steagall dissenting, held that § 6-11-23 was unconstitutional to the extent that it permitted a trial court to increase a jury's punitive-damages award.
[3] See, e.g., Life Ins. Co. of Georgia v. Parker, 726 So.2d 619 (Ala.1998) (35:1 ratio of punitive damages to compensatory damages approved in case tried in February 1996, well before this Court's opinion in BMW II was released, and in which the plaintiffs were financially vulnerable and in which substantial litigation costs were incurred); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala.1998) (17:1 ratio of punitive damages to compensatory damages approved in case tried in February 1997, before this Court's opinion in BMW II was released, and in which the plaintiff's economic loss was modest and no compensatory damages were awarded for loss or harm other than denied benefits).
[4] Section 6-11-21, Ala.Code 1975, establishes limits on punitive damages for cases filed more than 60 days after June 7, 1999. However, its enforcement would not render this discussion obsolete, because awards of punitive damages, falling under the limits expressed in the statute or not subject to such limits, will continue to be subject to constitutional scrutiny on a case-by-case basis.
[5] Exodus 22:1 (five oxen for theft of one ox, four sheep for theft of one sheep); II Samuel 12:6 (four lambs for theft of one lamb); Luke 19:8 (fourfold restitution for falsely accusing); Proverbs 6:31 (sevenfold restitution for theft).
[6] Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[2] This dangerous but logical interpretation is especially possible in this case because of the newspaper reports about the different result this Court reached on the first application for rehearing. Those reports read like this:

"Do you want to win a million dollars? Try criticizing the Alabama Supreme Court. It worked for a Montgomery attorney."
Phillip Rawls, "Lawyer Criticizes Supreme Court; Wins $1 Million," The Associated Press for The Huntsville Times, August 14, 2000, at B5.
"This is not so much a story of justice served or justice denied as it is of justice being put in an uncomfortable spotlight by a courageous lawyera lawyer even those who usually vilify lawyers can't help but salute.... [The Weatherlys' counsel] asked the high court to reconsiderand brazenly took the justices to the woodshed for what he considered kowtowing to the Big Mules and potential political contributors, like real estate firms, at the expense of the Average Joe.... [T]he justices, for reasons known only to themselves, found on a 6-3 vote that [the Weatherlys'] appeal had merit after all, and the court awarded the couple $1 million in damages.... But what won't go away is the question [the Weatherlys' counsel] asked in his appeal brief: Can we expect impartial justice when a Supreme Court candidate has to grovel among the rich and powerful to raise $5 million to campaign for an office that pays a yearly salary of $124,950? And if not, what can we do about it?"
Editorial, "Justices on Trial," The Huntsville Times, August 17, 2000 (as appearing on the "Alabama Live" website).
The article neglects to mention the immensely more powerful contributions of wealthy plaintiff trial lawyer firms to judicial candidates and those firms' lengthier history of contributing.
[3] I believe that it is a matter of record that real-estate companies contribute very little to judicial campaigns. This fact illustrates the fallacious and notorious nature of the accusation by plaintiffs' counsel regarding campaign contributions and this Court.